1

THE HONORABLE RICARDO S. MARTINEZ

2

3

4

5

6

**UNITED STATES DISTRICT COURT**
7   **WESTERN DISTRICT OF WASHINGTON**

8

| | |
|---|---|
| BRIAN D. BORGELT and CHARLES N. CARR, dba BULL'S EYE SHOOTERS SUPPLY, | NO.  C03-2630RSM |
| Petitioners, | INITIAL DECLARATION OF BRIAN D. BORGELT |
| v. | |
| THE BUREAU OF ALCOHOL, TOBACCO AND FIREARMS, | |
| Respondent. | |

15

I, Brian D. Borgelt, state as follows:

I am one of the petitioners in this proceeding.  I am 42 years old.  I am the second

of five children and the oldest male.  My older sister, Susan, works for Pfizer as a

veterinary pharmaceutical representative in Arizona.  My immediate younger sister, Linda,

lives in Loveland, Colorado and works as a computer technician.  The youngest, Sheri,

works as a cattle buyer in Kansas.  My younger brother Alan has taken over the family

farm and cattle feeding business in Nebraska.

INITIAL DECLARATION OF BRIAN D. BORGELT-1

Since the 1860's, first homesteading after the Civil War, the Borgelts have spent seven generations on the same piece of farmland in Nebraska, adding to it as years passed. Under family tradition the women went to college and the men worked the farm. All three of my sisters attended and graduated from a four year college. Alan did attend a vocational technical agricultural school, but I received absolutely no secondary education after high school. It was a family joke that it was "good to keep the men stupid," probably in light of the grueling life spent working the land.

The Borgelt farm and feedlot is located in Cumming County in northeast Nebraska. A small town, Wisner, of about 1,200 people, is located nearby. A town of any size, Norfolk, 50,000 people, is about 30 minutes away. Omaha, with its million people, is about two hours away.

Cumming County is, according to locals, a "land of great culture" as long as that culture involves "agriculture." Everything grown is used to feed to cattle and hogs. In addition to our farm and feedlot operation, which fed 10,000 to 12,000 cattle and hogs a year, the Borgelts held an interest in the local grain elevator.

My family ran a "modern" feedlot, that is one in which cattle and other stock are fed in confined areas. While this may not be the easiest or best method, either for man or beast, it is the most economically sound and used by nearly all American feedlots of any size.

My father was a stern, demanding workaholic, molded after my grandfather, and insisted that the boys work literally from sun up to sun down on the family farm and feedlot. My day began early when I would be awoken before dawn, both summer and

INITIAL DECLARATION OF BRIAN D. BORGELT-2

CABLE, LANGENBACH, KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

winter. After dressing and eating, I would, no later than 7:00 a.m., be tasked with feeding the ducks and the chickens. I would also participate in butchering, which occurred in the early morning hours. School was from 8:00 a.m. to 3:30 p.m. I would go straight to the feedlot from the time I was five years old. As a five year old, I was tasked with watching and operating the gates. As I grew older, I did more and more. Dinner would occur at 8:00 p.m. or later. By the time I was 13 years old, I could drive heavy equipment, weld, build fences, work livestock, and buck 100-pound hay bails, seven tiers high. I worked right along side of the men, all day long. That was expected.

School was a diversion and the boys were encouraged to take only vocational technical classes that were useful on the farm. I was not allowed to play sports or engage in other extracurricular activities, with one exception. The work was year round, 24/7. It was particularly brutal in the winter. At those times, we were required to blow the feeding bunks free of snow that had drifted in. The water would freeze and I would end up breaking ice in the water trough. We would commonly feed livestock in blizzard conditions. I remember at one point my brother's face froze during a particularly nasty episode. It was a land of extremes. The winter temperature could reach 100° below zero with the wind chill. In the summer, it was not uncommon to have temperatures of 100° to 110°. Frost would fall at the end of October, and by the end of December snow would be on the ground and remain there until March.

I was educated in a one room schoolhouse in District 43. There was one teacher, Mrs. Maxwell, who taught all grades from kindergarten through sixth grade. There were eight children in the school. I walked to and from school.

INITIAL DECLARATION OF BRIAN D. BORGELT-3

CABLE, LANGENBACH, KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

My middle school was combined with his high school.  I graduated from Pilger High School in Wisner, in a relatively large class of 54 students.  There were between 200 and 300 children in the entire school.  I wanted to take a college prep course, but my father refused to allow me to do so, he wanted me at the farm.  I took agriculture and shop classes and was an FAA member.  As for sports, I was allowed to walk to town after dinner to box, the only sporting activity I was permitted to engage in because it did not interfere with my farm work.

Once a year, during "slack time" in the summer, my family would take their annual vacation, always at the same place, Lake Akali.  The trip would last for four or five days. On only one occasion was a more extensive vacation taken.  In 1976, my family took a week long trip to Mount Rushmore.  My father felt that the trip took too long and another vacation was never permitted.

The farm was worked with one hired man, my dad, my uncle and me, and later my brother, Alan.  The work was the same on weekends as it was on weekdays, except there was no school to interfere.  Travel was not permitted as everyone had to be back for chores. By the time I had graduated from high school, except for that one vacation, the furthest I had traveled away from home was an hour, which had been a trip to a sale barn for cattle.

My father was killed in 1998 when a "fat steer" turned on him in the feedlot and rammed him into a gate.

With my hard work ethic background, it has been extremely difficult over the past few years to engage in what I call counter-productive activity as a reaction to unfair persecution.  Even as I sit here and write, rather than work to better my wounded business,

INITIAL DECLARATION OF BRIAN D. BORGELT-4

CABLE, LANGENBACH, KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1  I feel life and opportunity slipping away because of the energy required to correct injustice.

2  After my graduation from high school in 1982, I reached what I felt was the "low

3  point" of my life, prior to the events relating to my gun business. The farm crisis was in

4  full bloom, Willie Nelson started Farm Aid, and despite the hard work, our operation was

5  losing money. There was never any down or off time. Once, in the middle of the winter, a

6  cow was stuck in a lagoon filled with mud, water, cow piss, and cow shit. My father told

7  me to tie a rope on and sent me out in the lagoon to try to free the cow. Trapsing through

8  the stew of filth, dead cold, in heavy wet clothes and rubber boots, and wrestling with the

9  cow, I went under the surface and was nearly drowned. This was a turning point in my life.

10  I felt I had to get out, I was not yet 20, yet life was a dead end with no relief in sight.

11  Despite the objections of my family, particularly my father, I enlisted in the Army.

12  It was the only opportunity I saw to escape what had become a depressing and exhausting

13  life. I was attracted to the military both by the desire to serve my county and also by a

14  desire to escape the farm. My family was very upset because they were losing their best

15  "mule," so I delayed my entry into the Army until harvest was done and they could hire a

16  couple of new hands. Then, in November of 1985, I watched Wisner fade away in the side

17  mirror of my recruiter's car. I was ecstatic with the anticipation of a new life.

18  I underwent basic training and advanced infantry training at Fort Benning, Georgia.

19  This was the first time I had been away from rural Nebraska. The hard life in the feedlot

20  served me well in the military and I was admitted to Airborne School at Fort Benning. I

21  was slightly injured in my first jump but managed, with the aid of my friends, to hide the

22  injury from my superiors and I completed Airborne School on time. I was then sent to the

INITIAL DECLARATION OF BRIAN D. BORGELT-5

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

Ranger Indoctrination Program at Fort Benning. I picked Fort Lewis in the Northwest for permanent assignment because I had never seen any mountains in my life.

Even after you enter the Ranger Indoctrination Program, you don't immediately go to Ranger school. It takes between six months and two years to get into Ranger school. You must prove yourself before you are allowed to enter the Ranger school, which is the purpose of the Ranger Indoctrination Program. I was assigned to the Ranger Indoctrination Program in Fort Lewis. There I met the most vicious, sadistic and violent group of people I had ever been associated with in my life. Whether Christian Fundamentalists or devil worshippers, they were a hard and demanding group. Again, my life on the farm had prepared me.

It only took me about six or seven months to get into Ranger school because shortly after being assigned to Fort Lewis, one of the sergeants from a different company demanded a boxing competition with someone from his company. I volunteered and within a few seconds in the ring, knocked out a much older and more experienced man. Those evening boxing lessons paid off. I was taken under the wing of my own sergeant and within the smallest period of time possible, was admitted to the 58 day Ranger school.

Ranger training was also very difficult and by again hiding my injuries, common among the men, I was able to graduate on time. After Ranger school, I attended the Marine Corp sniper school and later received other service training. I took my noncommissioned officer board examinations and was made an E5. When I was discharged, I was categorized as a sniper. I was on the Army's Competitive Shooting Team and also worked as an instructor. I was involved in numerous competitions as a shooter for the Army. I was

INITIAL DECLARATION OF BRIAN D. BORGELT-6

CABLE, LANGENBACH, KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1   also part of the team that certified and trained everyone who left Fort Lewis for service in

2   the first Gulf War.  I was not sent to the Gulf War because the service demanded, despite

3   my volunteering, that I remain at Fort Lewis to instruct and certify.

4       With only a few months left on my enlistment, the unit was disbanded due to

5   budget cuts and politics and I was reassigned to the 3rd of the 47th infantry.  The war had

6   ended.

7       I have had a lifelong association with guns.  At the same time I began working the

8   gates in the feedlot at five years old, I was given my first gun, a .22 caliber rifle.  At about

9   age 12, I received a .410 shotgun.  I started shooting on my own at age 13.  I also helped

10  my younger brother, Alan, shoot safely.

11      The Borgelt men of three generations would often hunt together on the farm.  Birds,

12  varmints and, when in season, deer or other game were hunted.  I also ran a trap line and

13  sold raw fur, receiving money from both the trap line and from shooting animals.

14      I began buying and selling weapons in the Army in 1986.  I started out first ordering

15  some knives for myself and when my Ranger teammates saw them and wanted them, I

16  began selling knives and guns.  I began selling guns in Tacoma in 1986.  At that point,

17  there were about a quarter million licensed firearms dealers, most of whom did it as a

18  hobby business.  My primary objective in this gun buying and selling was to grow my own

19  collection, not to make money.  Any "profit" would be put back into the business in the

20  form of inventory.  In fact, most of my military paychecks would go into guns.  I enjoyed

21  the buying, selling and trading, with the objective to grow my own collection.

22

INITIAL DECLARATION OF BRIAN D. BORGELT-7

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1    I left the Army in 1992 and operated Pacific Shooters Supply from my home in

2  Tacoma.  I developed the concept of Bull's Eye Shooter Supply with one of my service

3  mates, Charles Carr, and we began Bull's Eye Shooter Supply in 1993 and opened the

4  retail store in 1994.  We worked full-time in renovating the building and opening the store

5  for nearly a year.  During this time, we lived off our savings and, in my case, some money

6  from my family.  We built an indoor shooting range and retail showroom in an abandoned

7  warehouse in Tacoma, Washington.  We had no other financial help, so with our limited

8  resources, we designed and fabricated the range using available, common materials.  With

9  the help of other army buddies, we also built the showroom.

10    We stocked the business with inventory I had been amassing with my army

11  paycheck while living small, and savings from years of farming prior to joining the army.

12  Carr contributed a sum of money, which he had recently received through an inheritance.

13    All of this was done at great personal sacrifice but with a focus on the future

14  through delayed gratification.  I gave up my army career, which was well on track, after 7

15  years of service.  I lost my first marriage to the effort and I gave up any semblance of a

16  social life for this pursuit.  I also forfeited my college assistance through the G.I. Bill,

17  which I had paid into for a year while an enlisted private on active duty.

18    With this intense focus, Bull's Eye took off like a rocket as soon as we opened the

19  door, creating an ever-increasing need for systems and manpower.  We handled this like a

20  military outfit, using the breakdown of task, conditions, and standards.  We became one of

21  the largest, if not the largest, gun dealer in Washington State.

22

INITIAL DECLARATION OF BRIAN D. BORGELT-8

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

My partner and I, having spent time in 2nd Ranger Battalion on Fort Lewis, expected our employees to rise to our standards and keep up with the pace and changes. I have since learned that I must explain this expectation of a high standard, as it is uncommon in the normal course of things. In a Ranger outfit, the weak, slow, and lazy have been weeded out by the time they get to their assigned squad in a Ranger battalion. Because of these standards and our having worked with men of a high esprit de corp, we ran hard, led by example, and thought the crew would follow – Sua Sponte (Of Our Own Accord) was our unit motto. This was our first disappointment in dealing with the general public. I know now that not only will some people fail to put forth the effort to achieve a high standard, they may also be jealous of and sabotage those who work hard. And, sadly, some also steal and are dishonest.

With our standards for completeness and accuracy not being met, we accepted what we were dealing with and learned to work with what we had. This was done mostly by staffing beyond what should have been necessary to run the company. Our only other option was to fold.

The business was complex, involving buying, selling, stocking, advertising, customer interaction, wholesaler interaction, insurance, maintenance, cleaning, dispute resolution, business networking, forecasting, repairs, filing, inventory, counseling, banking, payroll, bill pay, theft-loss prevention, accounting paperwork, business paperwork, product research, systems and policy implementation, reactions to the unknown, etc - this made delegation a necessity.

INITIAL DECLARATION OF BRIAN D. BORGELT-9

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1    We became a well-known business within the City of Tacoma, serving civilians,

2  military, and law enforcement alike.  We were respected in our industry for bringing the

3  enjoyment of firearms into the heart of an urban setting.  We taught defensive tactics and

4  enabled people to defend themselves against criminals.  We had a professional relationship

5  with the Bureau of Alcohol Tobacco and Firearms (ATF) enforcement agents who worked

6  our area and who would frequent our shop.

7    At no time did we ever promote or willingly contribute to the illegal use of

8  firearms.  We refused to carry "Saturday night specials" and other lucrative items because

9  we felt they were anti-societal weapons.

10    I helped the Pierce County Health Department create and promote a program called

11  "Project Lock-It-Up," which emphasized the safeguarding of firearms in the home from

12  children.  We eagerly helped local law enforcement officers with investigations of

13  homicide and other crimes involving the misuse of firearms.  We voluntarily ran the serial

14  numbers of all our acquired use guns, through our local patrol officer, who checked the

15  numbers to see if the guns had been reported stolen.  We did this although the ATF had no

16  provision or requirement to do so.

17    Our company was open seven days a week, approximately 360 days a year, 12

18  hours a day.  For a while we closed early on Sunday.  We had to open early and close late

19  for preparation and maintenance.  To do this, we had to run overlapping shifts.  Trust in our

20  employees was absolutely necessary and expected.  Also, my partner, Charles Carr, moved

21  back to Rhode Island, his home, to marry and become a commissioned law enforcement

22  officer.

INITIAL DECLARATION OF BRIAN D. BORGELT-10

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1    On March 28, 1997, a new federal firearms license was issued to Brian D. Borgelt

2  and Charles N. Carr using the trade name "Bulls Eye Shooter Supply."  An audit occurred

3  in 1998 by ATF Inspector Bonney, in which he noted, "This company has very complete

4  and accurate records."  Inspector Bonney gave Bull's Eye a clean bill of health, concluding

5  there were no violations.  He felt the miscount of guns or open lines in the bound book

6  "seems reasonable for the volume of guns."  Inspector Bonney's worksheets indicated that

7  "the firearms are accurately reported in bound records" and that "firearms examined were

8  properly marked and entered into the bound records."  He found that the Forms 4473 were

9  "very complete and accurate."  Inspector Bonney noted that "they are very concerned with

10  the accuracy of the 4473s and bound records and do this well."  Inspector Bonney went on

11  to compliment the operation on its documentation relating to police letterhead and multiple

12  sales forms, that individual theft losses on range guns had been addressed by changing the

13  range procedure and had solved the problem, and that Bulls Eye was in compliance with all

14  ATF and local police department theft reports.  Inspector Bonney concluded that all hits on

15  NCIC were non-prohibitory or dismissed and that no further action was needed.

16  Obviously, as shown by this very complete analysis, Bulls Eye was maintaining accurate

17  and complete records and working hard to do so.  Sadly, all that changed after an audit by

18  ATF Inspector Dimond in July 2000.

19    The inspector, John Dimond, began the inspection and soon made it clear that it

20  was the largest inventory and sales volume he had ever inspected.  He had a very difficult

21  task of cross-referencing open dispositions from our "acquisition and disposition (A&D)

22  book" with our standing inventory.  This is very understandable because our inventory

INITIAL DECLARATION OF BRIAN D. BORGELT-11

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1    didn't stand around long – it flowed continuously.  Not only did the inventory flow to end-

2    users in the form of over-the-counter sales, it flowed to and from gunsmiths for repair,

3    back to factories for repair and replacement, to other dealers in other states, and into

4    various holding stations in the shop for lay-aways and for awaiting-parts.  All of these

5    dispositions were to be properly recorded and held in file as per company policy.

6        Although initial figures showed us to be about 99% accurate, our large volume and

7    inventory made Inspector Dimond's initial open disposition count rather high in terms of

8    raw numbers.  At that point I involved myself with Inspector Dimond's audit and quickly

9    found that most of these "missing" guns were simply due to his oversight and his

10   experimental computer system used to match serial numbers from guns in inventory with

11   the spreadsheet he had created.  A large number of open entries claimed to exist by

12   Inspector Dimond were eliminated by my staff simply bringing him the weapons he missed

13   while doing his inventory.  Transposed numbers and mis-entered data, by Inspector

14   Dimond, were also a large part of the problem, and as I said, simple oversight on his part.  I

15   don't believe Inspector Dimond's mistakes were willful.

16       The audit was a failure in that it was inaccurate, but after a month of trying,

17   Inspector Dimond had to turn in a report.  He told me to keep working on finding

18   resolution to the "missing" firearm list, cited me for some human error paperwork issues,

19   and prescribed a new paperwork filing system for our firearms transaction forms (4473s).

20   This new system required the refiling of thousands of 4473s from the current chronological

21   order (which was legal) to a stock number sequential order (which was illegal).  Although a

22   monumental task, I agreed because the date sequence system in place didn't seem to be

INITIAL DECLARATION OF BRIAN D. BORGELT-12

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

working as well as it should have.  Unbeknownst to me at the time, that new system,

directed by Inspector Dimond, was later to be determined illegal, let alone impossible to

implement.  The reason he directed that we use this illegal system is that he thought it

would make subsequent audits easier for the ATF.

Inspector Dimond's audit found nine violations, only one of which (open entries in

the acquisitions and dispositions ("A&D") bound book) he found to be serious.  I was

called to the Seattle office of ATF area supervisor, Gary Bangs, for what was known as a

warning conference.  I met with Mr. Bangs alone in a conference room in a rather informal

setting.  We discussed the details of the audit and were both primarily concerned about the

disposition of the "missing" firearms, the only serious issue.  I spoke of past issues with

employees and possible theft by them; I spoke of the many open dispositions that had

already been closed, which had turned out to be oversights and filing discrepancies; I told

him of the new filing system that was being implemented at Inspector Dimond's request; I

told him that we were continuing to review paperwork and were steadily closing open

dispositions.

I invited him to conduct a sting operation of my shop with enforcement agents and

to install surveillance.  I made it clear that my intent was to achieve 100% accuracy with

my paperwork but that the human factor, which is imperfect, would never allow perfection.

Mr. Bangs told me that he had run a business in Iowa before joining the government work

force, and that he knew what it was like to run a business.  He said that he preferred

working for the government.  We laughed, but quickly got back to the purpose of our

meeting.  I told Mr. Bangs that I was concerned about the open display of our long guns

because customers could handle them freely; I also told him we had completely outgrown

INITIAL DECLARATION OF BRIAN D. BORGELT-13

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

our space and that had created a congested work environment; I told him that I was in

negotiation with my landlord to buy the building where we had been renting space in the

upstairs level; I told him this would give us the room we needed to regain our efficiency,

and implement new safeguards. We shook hands and he said we could expect another

inspection in a year.

I got back to the shop and called a meeting with my key personnel: my manager, my

buyer, my accountant, and senior sales staff. At the time, I employed between 10 and 14

people, depending on the season. I went over the notes of my meeting with Mr. Bangs. I

back-briefed them as we went, in order to achieve a clear understanding. I informed them

of the expectations of the ATF and my expectations, which were the same. I reiterated the

policies and procedures that were already in place and spoke of the new filing system

prescribed by Inspector Dimond. This new filing system became a major issue, as

everyone claimed they could not do their current job well if they had to get involved with

refilling paperwork.

Rather than argue, I hired a new employee exclusively to refile all the old 4473s

and maintain the files permanently. She was thoroughly trained to do this monumental task

and file all of the new paperwork as per the new policy. This added greatly to our cost of

doing business, but I saw no other way.

I negotiated a purchase agreement for the building and immediately began

reconfiguring the down-stairs to be the new show room; I built a controlled-access back

room for extra firearms; I built a space exclusively for lay-aways; I built a receiving room

and bought a computerized inventory control system, complete with firearm tracking

INITIAL DECLARATION OF BRIAN D. BORGELT-14

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

software; I placed the till in front of the double-door entrance and mandated that an employee would always have eyes on the door to help safeguard against theft; I shortened the hours that the retail shop was open in order to condense the sales staff; and I built a transition station for all guns going in and out of repair. I spent a tremendous amount of time, energy, and money on these efforts.

I finished the renovation at the end of 2001, fresh off a third audit held in September 2001 by Inspector Sanchez. Inspector Sanchez found no repeated violations and only two relatively minor violations. Inspector Sanchez noted in his report that he "did notice that the licensee had made improvements in record keeping and inventory controls." This relatively clean bill of health helped assure Bull's Eye that it was doing an adequate job. Everything looked great.

We spent the first couple of months of 2002 in transition, moving fixtures and inventory from up-stairs to down-stairs, while still conducting business in the old shop.

The new computer system was a complete disaster as we had incompatibility issues with some of the hardware and a long-gone employee who had configured the system and, as I learned later, was stealing from me so had every reason for the system to not work. With no time to reconfigure the system before the inventory started flowing down-stairs, we had no choice but to continue business with our old system while I brought in technical support to help. As we were in transition, this was very disappointing because we had lost our opportunity for a clean slate with a new system.

INITIAL DECLARATION OF BRIAN D. BORGELT-15

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

The firearm tracking system never did get implemented as I kept getting this excuse and that excuse from my in-house inventory control guy, who was Loren McKinney. It behooved Mr. McKinney to prevent the system's implementation as we later learned he too was stealing guns from the shop. The inventory control system was loaded full of inaccurate, useless data from a half-assed effort, and these thefts substantially drained the treasury of the company.

Apathy in the staff had grown to the point where everyone had a computer and a desk and no one wanted to deal with a customer. I figured everyone had gotten stressed by the move and the implementation of the new systems, only to later find out that my manager, Deb McCollum, had been slipping out early to do book keeping for others in an office she had set up somewhere for that purpose. She would even meet with them at my place of business on occasion.

The employee I had hired to reconfigure our filing system to the one illegally prescribed by the ATF was fired for her inability to get it done. To her credit, I discovered that multiple sales of firearms to an individual at the same time created a filing dilemma that among other things, made the Dimond system unworkable, highlighting the difference between theory and actuality. When the employee was gone, Deb McCollum began handling the treatment of the forms 4473. I was unaware of her actions as they were contrary to my instructions. She also began stealing guns, unknown to me. This was done in spite of the fact that I had hired several other new employees to do this filing task. At no time did I ever abandon this effort.

I had also recently fired Dan Nagy, who I had hired to research and install the new computer system. I had known Nagy through the army and figured I could trust him. Nagy

INITIAL DECLARATION OF BRIAN D. BORGELT-16

CABLE, LANGENBACH, KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

had been an office clerk in Ranger Battalion and a legal assistant of some sort for the Judge

Advocate General on Fort Lewis. A man in this capacity should be trustworthy. Not only

did he fail to get the system running, but he also managed to embezzle around $20,000

from the company through fraud and deception. I also later discovered that he had stolen

and or transferred through my books many firearms, which he then sold to the public. The

ATF was made aware of this and did nothing.

On 24 October 2002, the ATF and FBI came into my shop looking for the

disposition record of an AR15 type rifle, which had been found in the possession of the

Beltway Snipers on the East Coast. That is when all of the extraordinary scrutiny began.

The rifle was found as an open disposition in my A&D book but was obviously not in

inventory. I instructed my employees to go to the box room to see if the rifle box was there

- it was - with all of the accessories. This fact, by appearance, lessens the probability that

there was an "inside" theft of the rifle, as the boxes were not accessible to the public. The

agents began a series of questions during which my manager, Deb McCollum, blurted out,

"They're going to turn my lights off, I can't even pay my light bill." I looked at her with

disbelief, at the time not realizing that she was confessing to something. She had begun a

romantic relationship with one of my sales staff, Shawn McNally, and I soon learned that

the two of them had been plotting to open their own gun shop. This was later confirmed in

a wiretap of a conversation involving McNally, which was provided to me by the

government. I also learned from an ex-employee of mine, who had a business next to

where an ex-friend of McCollum works, that McCollum used to brag to her about all that

INITIAL DECLARATION OF BRIAN D. BORGELT-17

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1 she used to steal from me, including firearms. I'm still trying to get details on that, but I

2 have no agency cooperation or interest in this injustice. I also learned that McNally was

3 stealing numerous firearms. During the investigation, the government learned he had

4 pawned numerous guns stolen from me all over Tacoma, but again did nothing.

5 The news media poured in, antigun special interest groups protested in front of the

6 store, another big ATF audit kicked off, and a dozen ATF auditors, supervisory personnel

7 and legal counsel came in from a multi-state area. I offered my full cooperation.

8 I spoke with agents, they interviewed my staff, we determined that the rifle had

9 been on display near one of the counters in the far corner of the shop, fully accessorized by

10 Shawn McNally, who had been "gunsmithing" in his apartment and unbeknownst to me

11 had been sneaking Bull's Eye guns home to "practice" on. Deb McCollum, his would-be

12 partner, knew of all this.

13 A former roommate of McNally told police that McNally had been making

14 "silencers" in the apartment. The roommate passed a polygraph test. McNally refused to

15 take one. I have since learned from a former army acquaintance, that this is true, as

16 McNally offered him silencers as well as conversions of AR15 type rifles to fully

17 automatic fire capability. He refused the offer and only recently told me about it when we

18 were reacquainted.

19 I found out that Dan Nagy had remained in close contact with McNally and

20 McCollum. The ATF is aware of all these criminal relationships and has done nothing.

21 During the audit, the ATF began "leaking" numbers of "missing guns" to the

22 media, who posted them as front-page news. They used terms like "crime guns," "time-to-

INITIAL DECLARATION OF BRIAN D. BORGELT-18

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

crime," "trace requests," and other "secret" compiled data that we had never been privy to before and which were based on raw numbers, not percentages of business volume.

Dick VanLoan, the director of industry operations for ATF in Seattle, came down and got his picture taken on location for an agency periodical. It showed him kicked back in a chair with a clipboard, pretending to be assisting with the inventory audit.

News of my service to the country as a sniper instructor for the army came out. Conspiracy theories flew across the Internet.

I never stopped cooperating with authorities and actually believed that we were working together, as in the past, to solve yet another crime.

On 03 December 2002, agents called me at home to arrange another meeting with me at the shop the following morning at 0830. When I arrived, they initiated a raid, involving a search warrant filled with false information relating to bank activities (which they later admitted had been "mistaken"). The search warrant affidavit falsely claimed that I had made hundreds of thousands of dollars in cash deposits in various Key Bank locations around the country, including Washington, Ohio and New York. The impression was that I was engaged in some type of money laundering or illicit behavior in order to hide the receipt of these monies. The false statements in the warrant were due to the IRS' failure to act appropriately on information provided to it by Key Bank. These false allegations were picked up by the press and national media and portrayed me unfairly, in a very damaging and negative light. I was shocked, as they had had full access to everything for over a month. Agent Brad Devlin, ATF, told me that a raid was also going to take place at my home. He asked if anyone was there. I said "My wife". He asked if there were any dogs. I said "No." The agents met my wife at the door with guns drawn, yelling, "Don't move,

INITIAL DECLARATION OF BRIAN D. BORGELT-19

CABLE, LANGENBACH, KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

and show us your hands!"  Agent Devlin made contact via cell phone.  I told my wife to cooperate fully and answer all questions, but I was disappointed and angry at their obvious grandstanding for the press.

The agents told me that I was free to go while they conducted their search and that I was not under arrest; I told them I would stay and assist in any way I could.

Employees were called in and interviewed and I was notified that I had become the target of the investigation.  I was shocked.

A very credible federal government source working for the ATF called me a short time later and informed me that a Draconian directive had come down from the top to "put his [my] head on a plate, leave no stone unturned".

The investigation for criminal violations of the firearms and tax laws continued for nearly two years.  Throughout the two year investigation, the government, particularly the agencies involved, engaged in inappropriate if not illegal contact in communicating with the press, in contacting me although knowing I was represented by counsel, and in attempting to sabotage the sale of my business.  Fortunately, I was able to retain my firearms license long enough to keep Bull's Eye Shooter Supply open in order to sell it.

While I was being investigated for both criminal violations of the firearms laws and the tax code, the ATF took the necessary steps to revoke my firearms license.  A license revocation hearing was held on April 16, 2003.  The entire proceeding was somewhat a foregone conclusion.  The hearing examiner was an ATF Inspector from Milwaukee and the ultimate person who would decide the fate of my license was none other the Dick VanLoan, the Seattle supervisor who had posed for pictures during the audit.  Nevertheless, we put up a good defense.

INITIAL DECLARATION OF BRIAN D. BORGELT-20

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1    The notice of revocation contained four charges. The first involved the claim that a

2    total of 34 firearms were transferred without obtaining a completed form 4473. Actually,

3    at the hearing, Inspector Sherlock, who was supposedly in charge of the audit (but admitted

4    that she had not drafted the notice of revocation and in fact the notice differed in material

5    fashion from her report, in particular, noting that her report reflected only 78 open entries,

6    while the notice of revocation reflected 262 open entries), admitted that it was unknown

7    whether a form 4473 was prepared for each of the 34 weapons and was actually more likely

8    that the government agents were unable to find the forms 4473. That the forms 4473 were

9    actually prepared was buttressed by the fact that 25 of the 34 weapons charged were

10   located using the Washington State forms which had been filed with the Department of

11   Licensing in Olympia. These forms would have been filled out simultaneously with the

12   forms 4473. Interestingly, many of these alleged violations in count one also occurred

13   prior to the audit of the Inspector Sanchez in 2001 and should have been discovered by

14   him. In that regard, an examination of 25 weapons contained in the exhibit A in the notice

15   of revocation reflected only that 10 of the 25 weapons, not even a majority, were

16   transferred since Inspector Sanchez' audit concluded on September 12, 2003. The

17   government even charged transfers in 1997 and 1998, which pre-dated Inspector Bonney's

18   audit. Likewise, of the nine weapons listed in the text of the notice of revocation

19   document, only six were known to have been transferred since Inspector Dimond's audit in

20   September 2001. And of these six, one of the weapons charged related to a transfer date of

21   October 23, 2002, only a couple of days before Inspector Sherlock and the other agents

22   took control of the store.

INITIAL DECLARATION OF BRIAN D. BORGELT-21

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

Count two charged a violation based on the manner of retention of the forms 4473. Ironically, this method of retention was directed and authorized by Inspector Dimond in 2000 and further, was not commented upon or corrected by Inspector Sanchez or Gary Bangs, who I made aware of it in my conference with him. Both of these individuals were well aware of the use of the stock number retention system.

It was also because of this use of the stock number method, directed by the ATF, that Bull's Eye was forced to maintain such an extensive preliminary filing system prior to the final filing system. Bull's Eye was required to wait significant periods of time before filing the form permanently because once a stock number permanent filing was done, it is impossible to locate and identify a particular transaction in response to a trace, customer inquiry, or other request for information. The ATF went forward with this charge even though ATF counsel Larry Nickel admitted in a letter of February 21, 2003 that Inspector Dimond's "endorsement of the [stock number] method…was an error on Inspector Dimond's part." There were some claims at the hearing that Bull's Eye failed to maintain approximately 1,200 forms in any order. However, as testimony at the hearing firmly established, those forms were maintained in a particular order (by hundreds of stock numbers) and for the particular purpose (to provide ready access to a data base for law enforcement and customer inquiries). It was the use of the stock number method, as directed by Inspector Dimond, which led to this unfortunate necessity to maintain such an extensive number of these forms prior to a permanent filing.

Count three claimed that out of a total of 1,438 forms 4473 which were examined, 16 were not properly completed in that 12 contained no entries or incomplete entries for

INITIAL DECLARATION OF BRIAN D. BORGELT-22

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

questions 19, 20 and 21 and four forms contained no entries for questions 12, 13 and 14 relating to documentation of contact with the National Instant Criminal Background Check System (NICS). Again, the ATF went far back in history, as several of these violations (three) allegedly occurred prior to the audit of Inspector Sanchez. In fact, two of those three occurred prior to the audit of Inspector Dimond. Most importantly, all three which occurred prior to a subsequent audit where three of the four forms which reflected incomplete entries were awaiting documentation of contact with NICS. Further, as to the forms in existence when Inspector Sanchez (who did not find any violation) did his audit, some of these forms may have been previously noted in the audit of Inspector Dimond and had already been charged by Inspector Dimond in his violation report.

The 12 forms that reflected incomplete serial numbers are certainly not surprising because stock numbers were the focus of Bull's Eye employees and record keeping, as mandated by Inspector Dimond. Certainly with the method that was being used by Bull's Eye under Inspector Dimond's instruction and by the implicit approval of Supervisor Bangs and Inspector Sanchez, it is not surprising that 12 out of the 1,438 forms had small problems.

Count four related to the discrepancy between the bound books reflecting acquisitions and dispositions and the physical inventory. Again, the charges did not reflect the underlying reality. The charge contained in the notice of revocation claimed 262 firearms were unaccounted for, but as Inspector Sherlock indicated at the end of her audit, only 78 weapons were unaccounted for. It should be remembered that Inspector Sherlock admitted that she did not draft or review the notice of revocation and decide on what

INITIAL DECLARATION OF BRIAN D. BORGELT-23

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1   charges to bring, although she was supposedly in charge of the audit.  Perhaps one of the

2   most glaring distortions and unfair allegations relates to the 37 weapons that were sold on

3   October 18 or after, all at a time when the agents had come into the business and taken

4   control of the bound books.  A significant additional number of these forms charged as

5   open entries (12) occurred during the month of October 2002 for a grand total of 49

6   weapons accounted for and forms 4473 which had simply not been entered into the bound

7   book because of their recent creation or the control of the bound book by the government.

8   Another distortion by the ATF in its attempt to create a very inflated number was the

9   charging of guns sent to repair, approximately eight.  A repair log existed and contained all

10  the information required to be contained in the bound book.  Further, there was testimony

11  that this repair log was maintained at the direction of ATF personnel.

12      Twenty-two of the entries on the schedule of 262 weapons have no date at all

13  attached to them.  All of these weapons may have been transferred during the seven day

14  period before the seizure of the bound books by the ATF agents and their control of the

15  premises, or at some period before Inspector Sanchez' audit.  All of these were located as

16  far as their ultimate disposition.  Five of the weapons contained on the list of 262 related to

17  the fact that because of an error in stock number, there is a period of time in which there

18  were double entries.  Similar distortions related to weapons which had been reported

19  missing by Bull's Eye and four weapons which had been transferred to other firearms

20  licensees.  Lastly, the government repeated its old trick of going far back into the records of

21  Bull's Eye, well before Inspector Dimond's audit, to find weapons that were open at the

22  time of Inspector Dimond and Inspector Sanchez' audits, and were either not cleared or

INITIAL DECLARATION OF BRIAN D. BORGELT-24

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1   brought to the attention of Bull's Eye personnel by the Inspectors.  These weapons

2   numbered 52 total.

3        In addition to the distortions created by the schedule attached to the notice of

4   revocation, it is apparent that some of the uncleared weapons of the 78 that Inspector

5   Sherlock actually feels were unaccounted for were really not unaccounted for.  Many of

6   these weapons were found and accounted for after the inspection and Inspector Sherlock

7   testified as to errors committed by her and her team.  She acknowledged that entries listed

8   as open entries had been initialed by her staff and should therefore not have been listed as

9   an open entry during the audit.

10       It is also uncontroverted that unknown to me, numerous employees, who were also

11  responsible for the systems tracking weapons, making entries in those systems, and filling

12  out and filing the appropriate forms, were stealing large numbers of firearms from me.

13  Understanding this fact now certainly explains the number and existence of the open

14  entries not otherwise explained.

15       Lastly, these numbers need to be viewed in the context of the number of weapons

16  handled by Bull's Eye.  In the six years of its operation, nearly 25,000 weapons had passed

17  through Bull's Eye.  As noted by Inspector Bonney in his report, the "volume of guns" is

18  an appropriate factor in determining whether a violation exists and whether that violation

19  was willful.

20       Obviously, it is no surprise that the ATF Inspector recommended that my license be

21  revoked and that revocation was finalized and approved by Director Dick VanLoan.

22

INITIAL DECLARATION OF BRIAN D. BORGELT-25

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

With the revocation deadline looming, I had no choice but to sell my business quickly, which meant at a deep discount. The ATF tried desperately to prevent the sale by delaying the issuance of a license to the would-be buyer. This caused the buyer to incur thousands of dollars in legal fees to acquire a $200 license, and almost killed the sale. I lost all of the investment in structural improvements, computer hardware and software, all my fixtures, and name recognition built over years of hard work and sacrifice. I was forced to sell only for the estimated cost of my inventory.

Meanwhile, the criminal investigation continued. Ultimately, U.S. Attorney John McKay announced there would be no criminal prosecution of me for firearms violation because the government could not prove willfulness. However, I was indicted (not charged by information which is permitted for misdemeanors) for misdemeanors of failing to file income tax returns for several years.

When I worked for my father, he had taken care of filing returns. My returns filed in the Army were pretty much a pro forma affair and during my marriage my wife, who was an attorney, filed our income tax returns. It wasn't until I separated from my wife that I first encountered the obligation of actually filing a tax return.

In early 1995, I hired an accountant I found through the Little Nickel want ads. My accountant had only recently become an accountant, changing from his previous career of a dry cleaner. He didn't last long as an accountant either, leaving the profession in 1999 for yet another career in education.

Not knowing any better, Charles Carr and I had not kept documentation relating to investments of inventory, construction materials, payment of subcontractors, etc. which

INITIAL DECLARATION OF BRIAN D. BORGELT-26

CABLE, LANGENBACH, KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

would be needed to determine our capital contribution to the business. The accountant we hired through the Little Nickel want ads also told us that unless we made a profit, there was no real necessity to file a return. I also received the impression that it was more important to file a correct return than a timely return and was advised that the penalties would simply be civil. At the accountant's suggestion, I dutifully filed extensions twice a year for each return and had never been told that extensions beyond October 15 were not allowed.

There were form communications from the IRS during this time period which were directed to my accountant who claims that he forwarded them to me although I have no recollection of receiving them. However, during this period, I did, at my accountant's suggestions, make estimated tax payments in addition to filing for extensions.

With my accountant leaving the accounting profession, I changed accountants in 2000. This too contributed to delays in preparing returns. My new accountant was a CPA and a member of a respected accounting firm in Tacoma. I filed extensions and occasionally made estimated payments. In October 2002, my accountant sent me a draft of a tax return for my review, signature and filing. This return was present at my business when it was searched by the agents a few weeks later. That accountant testified he never told me it was a crime to fail to timely file a tax return and enforced my previous accountant's impression that the results would only be monetary penalties and interest. Obviously, I was wrong.

My attorney, Jim Frush, told me he felt I had an excellent chance of prevailing at a criminal trial as he did not believe the government could show willfulness in light of all the facts in the case. However, he also advised me that even if we walked out of the courtroom

INITIAL DECLARATION OF BRIAN D. BORGELT-27

CABLE, LANGENBACH, KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

after an acquittal, the IRS would come after me big time on civil matters. The IRS was making noises that I would be paying them somewhere between $600,000 and $1.5 million. Obviously, this would be impossible for me. Mr. Frush advised me that if I could get a determination of my tax liability that was reasonable, we should consider settling the case.

Shortly before trial, Mr. Frush was able to strike a deal with the government whereby I would plead guilty to one count for failure to file a tax return (1999) and that the government and we would agree that I owed something over $200,000 in back taxes, interest and penalties. This was a number I could live with (although not comfortably), but that I could live with and would not mean the end of my life as I knew it or the end of the business I kept after selling Bull's Eye. After I sold Bull's Eye, I had kept the shooting range upstairs in the building which I owned.

I didn't see any other reasonable way out of the situation and therefore agreed that my actions constituted willfulness and I pled guilty.

The sentencing range under the guidelines was eight to twelve months in prison.

The probation department did a presentence report and ended up recommending that I not spend any time in jail. They noted that I had taken numerous corrective actions, including efforts to compensate the IRS, and had tax preparers at those time to fulfill my obligations, and had always admitted my obligations to file tax returns when I had been questioned by the agents. They also felt that a sentence in imprisonment was excessive, particularly in light of the negative publicity surrounding the investigation which resulted in significant financial losses, and that any imprisonment was unnecessary in order to

INITIAL DECLARATION OF BRIAN D. BORGELT-28

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1   protect the public.  I believe they essentially saw me scapegoated by the government for the

2   sniper shootings and the government, unable to get me on criminal firearms violations, was

3   going to take its pound of flesh in a tax prosecution.

4        Mr. Frush also argued that I should not be sent to jail.  He noted no other case

5   existed, in his over 20 years of working in the federal criminal justice system as both a

6   prosecutor and a defense lawyer, where a failure to file case had been brought without

7   visits from revenue agents who warned the taxpayer that they were at risk of a criminal

8   prosecution, a necessary step usually undertaken to show the "willfulness" of the taxpayer.

9    This factor was mentioned by Judge Strombom who agreed with Mr. Frush and the

10  probation department and rejected the government's efforts to put me in jail. Judge

11  Strombom gave me a three year sentence of probation, noting that this was a "unique case"

12  and that she did "acknowledge and agree that the spotlight focused on Mr. Borgelt,

13  independent of tax problems, totally independent of that, that this is the shooter incident

14  that got the spotlight shining on your business, that had a significant consequence to you."

15  She said, "it's unique and that it came to light and then led to the criminal prosecution,

16  particularly in light of the steps being taken by the most recent account retained by Mr.

17  Borgelt."  Judge Strombom was referring to the fact that I had a tax return drafted and

18  ready to go on my desk which arrived there days before the agents raided by shop.

19       A week before the sentencing, the local paper, *The Tacoma News Tribune*, had

20  contained an article entitled, "They're Hot on the Money Trail Bash – Drug Dealers and

21  Money Launderer's Risk Long Arm of IRS Criminal Unit."  In it, I was highlighted by the

22  IRS personnel as a criminal.  It seems that the government could never issue yet another

INITIAL DECLARATION OF BRIAN D. BORGELT-29

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

press release or give another press interview without somehow mentioning the sniper shooting and the "notoriety" of me and my business.

During the sale of the business to the new owner, Kris Kindschuh, my senior salesman Loren McKinney, was caught illegally transferring a firearm from the shop to a man in the parking lot. It was a fluke that we caught him. The new owner, Mr. Kindschuh, contacted the ATF agent who went to the US Attorney's office to press charges. The U.S. Attorney said, "We're not going to spend a quarter of a million dollars prosecuting Mr. McKinney."

Mr. McKinney was also later found to have stolen guns from Bull's Eye inventory. Proof was given to the ATF but no charges were filed.

My intensions have always been to obey the laws governing the firearms industry. My expenditure of time and money, as well as cooperation with authorities has proven so. Any failures I have had along the way were not willful - they were expensive.

I have learned that you will be the last to know when someone is trying to take what you have – that's the nature of a thief.

I have had my reputation, my livelihood, and my peace-of-mind, stolen from me.

I ask for justice, and I ask to be made whole again.

I have an enormous amount of supporting information to build a case against those who violated federal law, but without an interest in this by the Justice Department, those criminals will go unpunished.

INITIAL DECLARATION OF BRIAN D. BORGELT-30

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1       I certify under penalty of perjury under the laws of the State of Washington that the

2   foregoing is true and correct.

3
        Respectfully submitted this 9th day of August, 2007.
4

5
                                    /s/
6                                   Brian D. Borgelt

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

INITIAL DECLARATION OF BRIAN D. BORGELT-31

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800