THE HONORABLE RICARDO S. MARTINEZ

1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

7
8

| | |
|---|---|
| BRIAN D. BORGELT and CHARLES N. CARR, dba BULL'S EYE SHOOTERS SUPPLY,<br><br>                              Petitioners,<br><br>        v.<br><br>THE BUREAU OF ALCOHOL, TOBACCO AND FIREARMS,<br><br>                              Respondent. | NO.  C03-2630RSM<br><br>FIRST SUPPLEMENTAL DECLARATION OF BRIAN D. BORGELT |

9
10
11
12
13
14
15

I, Brian D. Borgelt, state as follows:

I am one of the petitioners in this proceeding.  I understand it has been requested that I be more specific about the facts underlying my belief that my employees who were in charge of maintaining federal firearms records were stealing weapons from me; therefore, I make this Supplemental Declaration.

I have uncovered a conspiracy by several of my past employees by which they stole and resold to the public many guns from my inventory.  I'm sure there were also many dollars in "other" merchandise, which was stolen as well.  However, with no paper trail, I

16
17
18
19
20
21
22

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-1

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1    cannot prove that.

2          The Bureau of Alcohol Tobacco and Firearms (ATF) has some evidence that they

3    have not yet returned to me which may be helpful in proving my case.

4          Due to the very large volume of paperwork that I had to sift through in order to

5    establish the following facts, I have made a simple list of these facts.  They may not flow in

6    chronological order – they are simply known facts about an intertwined network of people

7    who targeted me before the Feds had their chance.  I am a simple man with no formal

8    education past high school.

9          The people of interest here are as follows:

10         1.    <u>Danny T. Nagy</u>.  I knew Nagy from the army and as a customer of my

11   former part-time business, "Pacific Shooter Supply."

12         Nagy would often come to my office at Bull's Eye Shooter Supply, the business I

13   founded and am fighting for, and would vent about problems he was having with his

14   business partner in a government procurement company in down town Tacoma, "Total

15   Supply and Procurement."  Although Nagy always had great amounts of cash, which he

16   would spend on guns at the shop, he claimed his partner was ripping him off.  Then one

17   day, Nagy came in looking very distraught and said that his partner had locked him out of

18   the business while police were going through things.  I asked what was going on and he

19   said that he didn't know.

20         Nagy was visiting nearly daily, seemingly looking for guidance.  He expressed a

21   desire to kill his partner and had purchased from the shop a very expensive HS Precision

22   bolt-action rifle, in dual calibers, which could be broken down to fit into a suitcase.  I told

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-2

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1  him, "living well was the best revenge" and asked him if he could start up and run a

2  procurement company on his own.  He said that he tried but he didn't have the capital since

3  his ex-partner stole it all.

4      I asked if the company could be quickly profitable and he said "absolutely."  I

5  suggested that we give it a go using my credit and his labor.  He quickly accepted and we

6  established a 50-50 partnership called "Bull's Eye Government Sales" and he did the rest.

7  Nagy lied about this to investigators, as he claimed to have no financial interest in the

8  company.

9      While the business was getting revved up, I offered Nagy a position in my company

10 as a project manager overseeing a major expansion of the shop and implementation of new

11 systems.  I paid him a $2,000 monthly salary.

12     At first Nagy seemed to be doing as I had anticipated, but soon he had a conflict

13 with just about everyone in the shop.  Then he started involving himself in various projects

14 which were not related to what I had hired him for, such as promotional events, gun shows

15 and auctions.  I eventually told him that I was not interested in becoming further divided

16 with my focus.  Then he was absent a lot.

17     Finally, at the end of 2001, with a string of failures, disappointments and

18 disagreements to show for my expense, I let Nagy go from Bull's Eye and told him to

19 concentrate on the procurement company which had done nothing but create debt for Bull's

20 Eye with layaways, which have never been paid off, to the tune of around $17,000.  I told

21 Nagy that what I had seen in him so far was not what it takes to make it in business.  He

22 took this as an insult rather than constructive criticism.  I gave Nagy $4,000 to save his

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-3

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1  house from foreclosure and another $500 for general support. Nagy said, "Thanks, this is

2  huge." I believe I've seen him once or twice since then, as he has avoided me and as I've

3  come to find out, he befriended Debra McCollum and Sean McNally, employees of mine.

4  I'll be writing about them next.

5       Bull's Eye Government Sales (BEGS) never paid or filed any taxes, as Nagy

6  refused to turn financial records over to my accountant for processing.

7       Although named in the government's search warrant, BEGS was not investigated or

8  charged with tax related issues.

9       Nagy had purchased 15 guns from Bull's Eye Shooter Supply (BESS) before he

10  worked there. Nagy "acquired" 41 guns from BESS while he worked there.

11       Nagy managed somehow (I suspect through Sean McNally) to "acquire" two

12  Bushmaster AR-15 type lower receivers from BESS on September 7, 2002. This is about

13  the time my shop received the rifle that was later used in the sniper killings.

14       Nagy had pawned a Bushmaster rifle, similar to the one used by the killers, on July

15  6, 2002, one month prior to acquiring the two lowers above. Nagy had taken this rifle from

16  my shop on August 10, 2001, one day after it arrived.

17       Nagy has pawned at least seven guns which were acquired from my shop, five of

18  them were acquired while he worked there. One was purchased from my shop by Sean

19  McNally.

20       Nagy was trafficking in guns, through my license, to the public. This is proven by

21  multiple sales of guns which were transferred to him soon after they arrived at the shop. I

22  have at least one witness who bought one of these weapons from Nagy without paperwork.

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-4

CABLE, LANGENBACH, KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

It's a Cobray M11, 9mm, serial number 940001748. It came in to my shop, ordered by Nagy, on November 28, 2000. He took it the same day. The purchaser's name is Michael Jacobsen and he has prepared a written statement.

Unknown to me, Nagy set up a deal with an auction company to use my license to transfer auctioned guns. He would take some of the shop's guns to auction for sale. I believe that this ruse was used to siphon guns from the shop. McCollum and McNally would also take and retrieve guns to and from auction.

2. Sean McNally. McNally visited my shop when he was working as a bounty hunter with a couple of other guys I knew, Guy Barattieri and Justin McGowan. Justin and Guy worked for me at a trade show and later worked at my shop. Both were ex-military. Guy was a West Point Graduate and ex-Special Forces captain. He was working for me while he applied to the FBI academy. Guy took a job with the Seattle Police Department and I believe Justin took a security job somewhere. It must have been in the 2000 time frame when I hired McNally. McNally just finished an enlistment at Fort Lewis in 2nd Ranger Bn as a company armorer. This was a valuable skill for an employee in a gun shop because it enabled him to talk technically with customers about mechanical aspects of the guns. I put him in charge of the military style weapons, as he was familiar with the latest and greatest gadgetry. That's really what drives the gun industry -- a bunch of wanna-bes buying high-tech gadgets. McNally was perfect for this role since he failed to hang with his assigned Ranger line squad and was relegated to the arms room.

McNally was never authorized to take guns home with him for repair or modification. I was unaware that he was doing this until the investigation began. Debra

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1  McCollum backed him up on this, since they were romantically involved and were

2  planning a business partnership, and I believe this ruse was also used to siphon guns from

3  the business. I don't believe the two of them were maintaining a logbook for this purpose,

4  as per federal regulations, as we did with any other gun that went out for repair.

5      When the investigation of Bull's Eye began, October 24, 2002, McNally was very

6  concerned about what the investigators were looking for. He would come up to my office

7  and very nervously question me about what was going on. I asked him if he had something

8  to be nervous about and that if he did, he'd better come clean. McNally, in response, told

9  me he had powerful friends who own Luciano's Casino on the waterfront in Tacoma. He

10 said they are very wealthy from bringing Pokemon to America from Japan. He said these

11 people offered him their high powered attorneys if he needed them. I said, "That's nice.

12 Do you need them?" He pressed for more answers as if I was running the investigation. I

13 told him to speak with Brian Downey, an ATF agent on the case, and not to worry if he had

14 nothing to hide. Having read the transcripts from the two wire-taps involving Jeff Pries

15 and him, and now knowing the collaboration between McNally, McCollum and Nagy, I

16 think he had plenty to be nervous about, if only the investigation would have taken its

17 rightful course.

18     I knew that McNally and Nagy had become friends while they worked here at the

19 shop. They would talk about the hours and hours that they would spend at home playing an

20 interactive computer game called "Pimp Wars." They said the game involved prostitution,

21 selling crack and buying thugs. The idea was to build an empire by killing your

22 competition with your thugs while financing your war with money from the drugs and

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-6

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1  prostitution.  While they were at work, they would express their concerns about losing their

2  criminal enterprises while they were away from the computer.  It was an obsession with

3  them.  They tried to get me involved and I told them that I had plenty to do with a real

4  business and encouraged them to get onboard.

5     Shortly prior to the investigation, McCollum and McNally were bragging openly

6  around the shop that they were looking at buying a new Harley Davidson motorcycle

7  together.  I found this odd, since they always complained about money issues.

8     On many occasions, some of my Ranger friends and associates would come to me

9  with concerns about McNally telling exaggerated stories about his experience in Ranger Bn

10  while working behind my gun counter.  As I said, McNally failed as a Ranger and it is my

11  understanding that he never even attended Ranger school.

12     McNally worked for me during two different time periods.  After he left the first

13  time, I caught an employee, Michael Tutwiler, an Army private, stealing from me.  The

14  only way I caught Tutwiler was that a friend of his, Jacob Bunting, called me and told me

15  so.  I confronted Tutwiler.  He lied, but after putting the pressure to him, he spilled his

16  guts.  I put him on a strict timetable to repay what he had admitted to stealing.  He never

17  confessed to nor was he accused of stealing any guns.  Tutwiler, Bunting and McNally had

18  been hanging out at a gun shop called Champion Arms, in Fife.  Tutwiler, who gave me a

19  taped conversation between the three, told me this.  Tutwiler repaid his debt and I let him

20  go without prosecution since I'd already wasted time with the legal system trying to

21  prosecute people for theft.

22     McNally returned wanting his job back.  I told him of the concerns I had of his

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-7

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

affiliation with those other two fellas and of his loyalty.  He got defensive and said that it

was illegal to tape conversations.  I told him that I never taped it, but having heard it, I

needed an explanation.  He said that he was there as an observer/bodyguard for Bunting,

who was at odds with Tutwiler.  Having just caught Tutwiler and knowing other bounty

hunters that McNally worked with, I told him that I needed honesty, loyalty and more than

an in-and-out commitment.  He assured me that he would perform to those standards and I

rehired him.

Not long after that, he began a romantic relationship with Debra McCollum, my

manager/book keeper.  I couldn't decide whether McNally and McCollum's relationship

was good for the company but I decided not to interfere in light of McCollum's large

family and broken marriage.

Then the rifle trace incident on October 24, 2002 triggered a lot of questions.

Unknown to me, McNally had acquired and pawned several guns from Bull's Eye.

McNally had escalated his claim of being a gunsmith and was now trying to do a lot of in-

shop projects, as well as take-home work.  As I said before, McNally was never authorized

to take guns from the shop home.

McNally refused a polygraph test and was accused, by a former roommate, of

modifying weapons illegally.  She took a polygraph test to this effect and passed.  McNally

claimed that he did not have the equipment to make illegal modifications.  McNally had

been an "apprentice" gunsmith with different gunsmiths in the area who had the equipment

to make these illegal modifications.  Someone had shortened and threaded a rifle barrel for

Muhammad between late 2001 and September 15, 2002.

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-8

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1   McNally and McCollum became increasingly secretive.  Finally, after I confronted

2   McNally about being repeatedly late and doing unauthorized gunsmithing, he got in my

3   face with a challenging posture.  I reminded him where the door was and he walked out.  I

4   don't recall seeing him but a couple of times after that – once for a paycheck, and maybe

5   something else.

6       ATF Agent Richard Byrd told an associate of mine, Robert Hummelbaugh, that

7   Sean McNally was dead - that he was killed in Iraq.  Though I have many associates

8   operating in that theatre, I have been unable to confirm this.

9       Jacob Bunting's father called me at my office to inform me that Michael Tutwiler

10  was dead.  He gave no details.

11      Al Hanson, a customer of Bull's Eye, called me on November 24, 2002 to inform

12  me that McNally had stolen a set of AR-15 hand guards from the shop and sold them to

13  him at the shop.  I did not question McNally about this as I figured there was more to the

14  picture than that, with circumstances being what they were.

15      McNally absconded with thousands of dollars worth of guns (19) from the shop

16  while he worked there.  This is based only on what I have a paper trail for.  He had every

17  opportunity to take guns with no paper trail, so there were probably more taken.

18      McNally had pawned 14 guns which he acquired from somewhere else.

19      McNally had pawned 11 guns from Bull's Eye.

20      Nagy had pawned a gun which was acquired from Bull's Eye by McNally.

21      McNally had pawned a pistol which was acquired from Bull's Eye by McCollum.

22

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-9

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

Nagy told investigators that McNally couldn't afford to eat regular food, yet he had all these guns.

There is more than I can list here, in the two transcripts, from the wiretapped conversations between McNally and Jeff Pries who had just returned from "training" in New Jersey.

3. Debra McCollum. Debra McCollum was hired as a bookkeeper, I believe in 1997, after I broke up with my fiancé who had been doing bookkeeping for me. After interviewing several people for the position, I hired McCollum because she gave a very confidant interview and stated that she could handle all accounting for a growing company. She also told me that she had five kids and coming from a family with five kids myself, I figured she would work hard to support them.

During the interview, I told McCollum of some problems I had in the past with employee theft. She said, "I used to run a construction company and I know every trick in the book." I wasn't sure whether that was good or bad, but I believed that she intended to use that knowledge for good – in the beginning, I believe she did.

It didn't take long to find out that McCollum's husband was unsupportive of the family. McCollum would have days when she would come to work unbathed, haggard and irritable. She would talk openly about what a no-good s.o.b. her husband was. She was always quick to reach for the drama when confronted with serious matters as a way of deflecting responsibility. A routine meeting with her in my office, covering business matters and my expectations, produced a blubbering pile of Jell-O and a five minute tirade

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

about how horrible her life was.  She said that she couldn't take my "yelling" at her.  In retrospect, I should have fired her, but being overwhelmed with the growth rate of a new business, I was forced to accept that much from people rather than start over continuously from scratch.  Hindsight is always 20-20.

McCollum may have been stealing from the start, as she would never produce a profit-and-loss statement or any other real business management reports.  All I ever saw were monthly sales reports and bank balances.  She counted all the cash, checks and charge slips, and prepared daily bank deposits which I would generally take to the bank.  She had a strange system of depositing only bills larger than $20, keeping the rest for petty cash and starts for the till.  I challenged her on this several times, as I thought the deposit should match the sales.  McCollum would go into a theatrical performance to avoid this change.  Regardless of the fact that she saved all the money, $10 and under, she would still have me bring her hundreds of dollars in change, on a regular basis, from the bank.  I didn't see this as suspicious since we did a lot of cash business and made a lot of change for people.

Besides this very simple duty, all McCollum had to do was pay taxes as they came due, do payroll, pay invoices, maintain our ATF "acquisition and disposition" (A&D) book, which averaged out to be a couple a dozen guns a day, and file and maintain the ATF forms 4473 and other forms.

With the exception of the A&D book, of course, my current bookkeeper does all of these other things, spending about 15 minutes a week in my shop, and I have complete financial reporting.  God only knows what McCollum was doing with all that time, five days a week.

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-11

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

I had told her about my inability to calculate my income taxes due to the fact that I had no exact figures for initial contributions and construction costs between my partner, Charles Carr, and me. The reason for this is that we built the range and show room kind of by the seat of our pants and never archived receipts as well as we should have. I also contributed inventory and equipment without first determining a value. This made establishing an initial contribution impossible. Without initial contributions, calculation of income tax was impossible.

McCollum said that she had experience with these matters, and that eventually an estimate would have to be worked out with the IRS. We agreed that a profit beyond initial contributions had not been achieved to that point, and put it on the back burner. She never once advised of a filing requirement, regardless of profit, although she fancied herself as a "tax specialist." (She would later use this transparent sharing of information to cast the spotlight on me, making it appear as if I was purposely avoiding the payment of taxes. She succeeded in doing this, as the Feds took it hook-line-and-sinker. The investigation targeted me from that point and she, along with her accomplices, walked away laughing.)

With McCollum not meeting my expectations with accounting, and my desire to get the income tax issue up to date, I started looking for her replacement.

I didn't want to fire McCollum, as she did have some good organizational skills, which I do not have. Besides, I guess I have a soft heart, and was thinking of her five kids – I believe her husband had recently left her as well – they later divorced.

The opportunity came when my store manager, Loren McKinney, started neglecting his duties when his son got arrested for statutory rape. McKinney's performance went

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1  down as he became more and more involved with his son's defense. I asked McCollum if

2  she was interested in that position with a pay increase and she accepted. I demoted

3  McKinney back to sales, but kept him on salary, with an increase in pay.

4      I brought in Connie Sheehan, who had 30 years of experience, to do the accounting.

5  I introduced her to my CPA and told them to start working on the income tax issue, as well

6  as the day-to-day accounting.

7      This was also about the time that I brought in Dan Nagy and started Bull's Eye

8  Government Sales (BEGS) with him, as a 50-50 partnership. Nagy refused to submit any

9  paperwork from BEGS to Sheehan. As a result, no taxes were ever filed for that company.

10  The IRS knows this and has done nothing about it.

11      Nagy began spying on Sheehan and accused her of doing work for other clients out

12  of my office. Nagy found several hundred dollars in cash, in a bag, in Sheehan's desk. I

13  confronted Sheehan about the money and she stated that she had never worked for a

14  company which dealt in cash, and that she didn't know what to do with it. It was a

15  ridiculous response, and she soon quit. I had paid her $3,000 a month for about a year with

16  no gain. At that time I still trusted and confided in Nagy, although I never understood why

17  he would not allow the accountant access to the books for BEGS.

18      These were very busy times, as we just had an unfavorable audit of our A&D books

19  from the ATF, which resulted in the direction, by the inspecting agent, to illegally refile our

20  entire records archive.

21      With an urgent need for a bookkeeper, I hired Sharon Jobin, who was a friend and

22  customer of the shop. It became immediately clear that Sharon was unable to work with

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-13

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

the system, and agreed to help me hire someone else.

We interviewed and hired Susan Haft. As they all seem to be able to do, Haft gave a good interview, but turned out to be incompetent and unstable. Haft would do such things as staple a check to an invoice and file it rather than mail it. She would make absurd claims about items from the shop appearing in her apartment and then back in the shop. She would say that people ran through her apartment at all hours of the night. I had to let her go. I regretfully allowed Deb McCollum to re-commandeer her position and regain control of the company finances. Again, hindsight is 20-20. And this was in the middle of a giant remodel and our daily business volume.

We had recently completed a great ATF audit by inspector Kent Sanchez, with 100% accountability, however, so I figured the most important aspect, weapons accountability, was being accomplished. All else, regardless of its chaotic nature, was manageable. As a Ranger, I was programmed to react to chaos, in the midst of the unknown – this was no different.

When the federal investigation kicked off, October 24, 2002, over a dozen agents swarmed into the business, along with ATF lawyers and supervisors, looking for the disposition paperwork for the Bushmaster rifle, which was recovered with the sniper killers. After finding it as an open disposition in the A&D book, and a thorough search of the shop, we retrieved the gun's box from the back room.

Deb McCollum grew increasingly nervous and suddenly, in front of me, my buyer Dave Reinikka, and a bunch of agents from the ATF and FBI, she blurted out, "they're going to turn my lights off, I can't even pay my light bill." This was an admission of some

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-14

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

sort, and was typical of her kind of reaction to being cornered.  I sincerely believe that she expected to be rolled up in this deal, and was looking for sympathy.  Not knowing then, what I know now, I was shocked, but dismissed it as McCollum theatrics.

McCollum and McNally began talking in hushed tones with their hands covering their mouths.  They were thick-as-thieves, and very suspicious of what was going on with the investigation.

As a practice, I had McCollum keep track of all employee purchases, from the shop, in an 8 ½ x 11" spiral bound notebook.  Employees were allowed a discount on merchandise, but were not allowed to ring up their own sales – this was to prevent internal theft.  The purpose of the book was to keep a record of items purchased by employees, so that when I saw them with an item, I could cross-reference the log to see if it had been paid for.  When a page was full in the book, McCollum was to bring it to me, and I would keep it archived in my desk file.  She came to my office shortly after the investigation began, and asked to see the file with all of those pages in it.  She said she needed it to crosscheck some employee purchases.  I gave it to her and I never saw it again.

I now understand that she, Nagy, McKinney, and McNally, testified that I would allow them to take guns from the shop in lieu of pay or overtime.  This is an absolute lie, as I did allow this practice for the regular hourly employees, but not the salaried employees.  I believe that McCollum used these papers to make this claim appear true, and to cover the many guns which they were later shown to have taken from my business by then.  Connie Sheehan can attest to the fact that this was not an allowable practice when she was doing payroll, or withholdings would have been taken out of their pay for this "alternative

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-15

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1   compensation." You can also check their 1040 income tax returns. If guns were received

2   as compensation, and not reported as income, that would be tax evasion.

3        This issue is absolute proof that McCollum, McNally, Nagy and McKinney

4   conspired to not only steal guns from Bull's Eye, but they also collaboratively lied to

5   investigators, and perjured themselves before the court.

6        I have the following comments on investigatory statements received from the

7   government:

8        <u>Debra McCollum's statements to ATF agent Brad Devlin on December 9, 2002:</u>

9        Brian Borgelt "is greedy" (paragraph 2). (*I gave this woman a ton of latitude with*

10  *her job, so that she could respond to the circumstances with five kids. I gave her multiple*

11  *pay raises, paid vacation, Christmas bonuses, and I supported her 100%, with employees*

12  *and equipment to run the business. I divided her responsibilities so that she could achieve*

13  *accountability with the paperwork. When she said she couldn't feed her kids, I gave her a*

14  *large cooler full of meat, from a buffalo I had butchered (she kept the cooler and never*

15  *said thanks). Despite all this, she stole from me and aided others in doing so. ATF agent*

16  *Brad Devlin agrees with me on this, but I was targeted instead.*)

17        She admits that it was her responsibility to enter data into the A&D book

18  (paragraph 2).

19        She admits that the so called "stolen guns" are a result of "messed up paperwork"

20  (paragraph 3).

21        She states that she "has never been informed of the laws by an ATF inspector or

22  ATF agent." (*She contradicts this statement in her statement to IRS agent Cathy Cowley,*

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-16

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1   *on December 4, 2002.*  Paragraph 12).

2       <u>Debra McCollum statements to IRS agent Cathy Cowley and ATF agent Brad</u>

3   <u>Devlin on December 4, 2002:</u>

4       McCollum states that "she feels it is not her responsibility to get his tax information

5   together" because the information could be easily extracted from the computer and

6   submitted to the CPA, but he just doesn't do it" (paragraph 5).  (*McCollum was hired to do*

7   *accounting for the company and claimed to be a "tax specialist."  How could it not have*

8   *been her responsibility?  McCollum says that the necessary information "could be easily*

9   *extracted from the computer."  She knew perfectly well, that the necessary information,*

10  *"initial contributions," was not in any computer.  If it was, why didn't she simply*

11  *download it herself?*)

12      McCollum states that the store makes a "ton of money" (paragraph 6).  (*McCollum*

13  *never produced a single profit-and-loss, or financial statement for the company.*)

14      "McCollum does not feel there have been guns stolen out of the store, but instead

15  believes that it is just a paperwork mess that has caused the discrepancies.  She believes

16  that when you have 26,000 papers to file, mistakes happen" (paragraph 7).  (*Besides a few*

17  *minutes a day of accounting, this is all she had to do.  The new owner of the shop has a*

18  *part-time accountant and has no problems with firearms paperwork, using the same paper*

19  *A&D book.  McCollum's failures, coupled with the activities of Nagy, McNally, and*

20  *McKinney, look a lot more like sabotage to cover their thefts.*)

21      In paragraph 8, McCollum explains my attempts to separate bookkeeping from

22  management.  I tried three bookkeepers, but I believe McCollum truly wanted to get her

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-17

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

hands on the money again, to siphon cash. She immediately had animosity with Connie Sheehan, as shown where she calls Sheehan "just a bookkeeper" rather than a CFO. I hired Sheehan as a CFO and introduced her to the staff as such. McCollum says that she was overwhelmed. I believed this to be true at the time, but in retrospect, there was no reason that she could not do her job.

In paragraph 12, McCollum admits that she is behind in her paperwork duties, and again says she has a "work overload." McCollum contradicts herself, from her statement to ATF agent Brad Devlin on December 4, 2002, the same day (paragraph 3). McCollum states that she advised me of problems which the ATF identified. This conflicts with her previous statement, where she says that she "has never been informed of the laws by an ATF inspector or an ATF agent".

In paragraph 13, McCollum defends McNally as "very straight." She defends Nagy as a "friend" who has been "maligned" by me. McCollum states that she was aware of the paperwork (forms 4473) proving Nagy's acquisition of many guns through the shop, yet instead of helping me with this investigation, she defends Nagy.

My management staff (paragraph 15), including McCollum, were given paid vacations each year. This is the first time she ever said anything about it being unfair. McCollum was in charge of payroll, exclusively. If she did not calculate overtime, it was by her own doing.

In paragraph 16, McCollum admits that she was paying some of my employees, herself included, other than what they had earned.

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-18

CABLE, LANGENBACH, KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

After giving this statement, McCollum then came upstairs and joined me in the back room, where I was waiting and assisting agents with their search. She was very nice to me and never portrayed any of these derogatory positions which she held against me.

Debra McCollum's statements to Brenda Barnes and Carrie Breed, IRS, November 12, 2003:

Paragraph 5 is absolute proof of the collaborative efforts between McCollum, McNally, McKinney and Nagy to create a story justifying the large number of guns they are shown, on paper, to have taken from my business. In her initial statements, there was no mention of these many guns, even though the main thrust of the investigation surrounded weapons dispositions and employee conduct. McCollum and the others had been working on this alibi for about a year.

In paragraph 6, McCollum admits that I was actively working on my tax situation with Connie Sheehan; however, the records were incomplete and did not represent an accurate statement. At the same time, all McCollum had to do was manage the staff and the gun paperwork.

In paragraph 8, McCollum states that in 2000 "employees" started noticing that cash did not come back from the gun shows and that I only returned with checks and "credit card money." This is a complete fabrication. The only way the other "employees" could have known this is if McCollum, or whoever was doing the accounting at the time, was spreading these rumors.

McCollum in the very next paragraph (paragraph 9), says that 100% of the cash from the shop, was deposited in the bank. When she was the bookkeeper, she handled

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-19

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

100% of the cash, I trusted her. All I did was deposit it. In August or September of 2002, I even gave her signing authority on the business checking account. This is proof that I was oblivious to all of this so-called bitterness and spreading of rumors.

McCollum states in paragraph 10 that I paid $30,000 in cash for a car. Not only is this absolutely false, but she was in no way involved with this transaction nor was she involved with any personal transactions of mine.

In paragraph 11, McCollum speaks of the trade-in system, which involved two-part carbonless pads, to record a transaction. *I put her in charge of accounting for 100% of the sequentially numbered invoices and insisted that she show me all of the slips, as they were generated, for review. I did this because I always saw the trade-in of used guns as a vulnerable spot in the company, for employee theft. McCollum was never able to fulfill this request with 100% accountability, and at no time did she say the "missing" slips were being used for "employee purchase" or "employee credit."*

McCollum states in paragraph 12 that after Sharon left the company, McCollum prepared the Washington State tax returns. *This is false – Susan Haft took over this duty.*

Paragraph 14 outlines McCollum's jealousy and most probably explains her actions and hidden agenda.

In paragraph 16, McCollum states that I got her ex-husband involved in a pyramid scheme. (*I never talked to her husband about getting involved with anything. I despised the man for walking out on his family.*)

In the final statement, "Conclusion of interview," McCollum stated that she would look on her computer and see if she had any financial documents and records from

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-20

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1  BULL'S EYE SHOOTER SUPPLY".  There is absolutely no reason McCollum should

2  have had information from the shop, on her computer, as she had her own workstation and

3  computer at the shop.

4      <u>Additional facts about McCollum</u>:

5      McCollum "acquired" at least six guns from the shop, "on paper."

6      McCollum took from the shop, and gave to McNally, a Glock handgun.

7      McNally pawned a gun that was "acquired" from the shop, by McCollum.

8      McCollum began working at Taylor Auction after being fired from her position at

9  Bull's Eye by the new owner, Kris Kindschuh.  I believe she may have been doing this

10 while receiving unemployment benefits.  Taylor Auction is the place McCollum, Nagy and

11 McNally used to take guns to and from Bull's Eye for sale and transfer.  Nagy went to great

12 lengths to set up this "arrangement."

13     Despite the fact that I had hired a personal assistant for McCollum, the paperwork

14 and filing still never got done properly.  McCollum hired a file clerk who worked at the

15 shop for a while but it wasn't until the clerk left, that McCollum informed me that the clerk

16 had been convicted of welfare fraud and had recently broken up with her brother.  This was

17 in violation of company policy in that all employees have and be eligible for a concealed

18 weapon permit.

19     While McCollum claims to have been "overwhelmed" with her duties at the shop,

20 she was maintaining an office somewhere in town and doing accounting and tax

21 preparation for other people.  At times, she would meet clients at my place of business.

22

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-21

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

I doubt that the IRS has looked into the reporting of income from her side business.

McCollum received paychecks bi-monthly, for $1,284.72.  On June 23, 2003, she wrote herself a check, from the business, for $1,816.59.  She apparently cashed the check at my bank "for cash" as it has her fingerprint on it.  On 6-16-03, she had written a check from the business "for cash" in the amount of $1,365.75.

After McCollum was gone from the business and I was preparing my archived records and A&D books for turn-in to the ATF, as per regulation, I discovered that McCollum had filed hundreds of forms 4473 without signing the guns out of the A&D book.  I told ATF Agent Martha Tebbenkamp about this and asked for more time with the records to get a better picture of what actually represented "missing guns."  She refused and my records were taken.

One day, about a year after the investigation began, as I was pulling into the parking lot, I caught Loren McKinney walking to his vehicle from the shop with a rifle under his arm.  I confronted him asking, "Got yourself a new rifle Mac?"  Nervously, he said, "We picked this piece of s**t up for $5 and I paid the shop $20 for it."  I walked immediately into McCollum's office and asked her about it.  She said, "I don't know anything about it."  I said, "Let's see the paperwork for the purchase and the 4473."  The purchase papers showed that we had paid $20 for the rifle, but there was no 4473.  I ran a sales report and there was no transaction showing that it had been paid for.  The next day, I asked McCollum again about it.  She immediately produced a 4473 signed by her, backdated to the day before, showing the transfer of that rifle plus a Colt revolver.  Upon running another sales report, it was clear that neither gun had been paid for.  I told this to ATF

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-22

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1   Agent Brad Devlin but nothing became of it.

2          In hindsight, I believe that McCollum, having seen the lack of involvement by the

3   ATF following the 2000 audit, with the exception of a follow-up audit a year later, caused

4   her to think that there were no real penalties for open dispositions, and that in the future

5   they would once again be written off as "missing guns." The subsequent audit, in 2001,

6   which showed no new "missing guns," serves as a starting point for when the internal

7   campaign of theft began.

8          In my investigation, I have uncovered hundreds of blatantly disregarded company

9   policies and procedures by McCollum that were completely avoidable. At one point during

10  the course of the investigation as I was working with McCollum to close open dispositions

11  in our A&D books, she looked at me coolly and said, "Someone's got to lose." I was

12  shocked and confused by this at the time.

13         4.     Loren McKinney. Loren McKinney started working for me as a salesman

14  and was later moved to the position of manager. He is retired from the US Air Force as a

15  Master Sergeant. As per industry publications for the shooting sports, McKinney is a

16  model employee for a gun shop.

17         McKinney is a good salesman and his monthly sales numbers were always near the

18  top. His wife was a veteran of many years, as a civilian for the military exchange store, on

19  McChord Air Force Base. They had one child left at home and seemingly had plenty of

20  income, not to be a theft risk to my business.

21

22

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-23

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1    McKinney was doing a satisfactory job of managing the shop until his son was

2    charged with statutory rape. As McKinney spent more and more time and thought,

3    defending his son, I demoted him back to sales and put Debra McCollum in as manager,

4    while bringing Connie Sheehan on as CFO for accounting.

5        As my buyer, Dave Reinikka, fell behind with purchases, I gave McKinney the

6    shared duty of buying merchandise for the shop.

7        Since we were in the middle of the dot-com boom and everyone thought brick and

8    mortar stores would be replaced with internet sales, McKinney was put in charge of

9    running an on-line sales segment of the company. This was a loser of an investment in

10   time, and really served as more of a distraction than a benefit.

11       McKinney also ran an e-mail address for the shop which he would use for

12   correspondence with customers and suppliers – also more of a distraction. After the

13   second virus being imported into our system through e-mail, I told McKinney to shut it

14   down and go back to the telephone for that purpose. McKinney disregarded my order and

15   it wasn't until 8-July-2003, that I discovered this. It was from an e-mail message

16   McKinney sent that I noticed he was still in contact with an ex-employee, Bryan Rivas.

17   During the course of the investigation, an investigator from New Jersey contacted me. The

18   investigator wanted to know about a certain AR-15 type rifle, which was found a couple of

19   miles from where John Muhammad had purchased the car they used while on their killing

20   spree. A look through our A&D book showed the rifle to have been sold by Bryan Rivas.

21       Another gun, a Ruger 10/22T, was reported "missing" in our A&D book from the

22   2000 audit. Research turned up paperwork showing the gun being returned to the Ruger

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-24

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1  factory for repair by Loren McKinney for Bryan Rivas.

2       As I stated above in the McCollum section, McKinney was caught red handed

3  stealing guns from the shop, aided by McCollum.  The ATF did nothing.

4       McKinney was still working for the shop under the new owner after the forced sale

5  when we caught him delivering a 1911 frame (a firearm) from the shop to a person in the

6  parking lot, with no paperwork.  The fact that Kris Kindschuh (the new owner) and I

7  caught him was a fluke.  We just happened to be standing there, not sure what we were

8  witnessing, and the owner of the gun showed up.  McKinney handed him the cash which

9  McKinney had received from the purchaser.  This was the selling of a firearm at a gun shop

10 without paperwork.  McKinney claimed the gun was not the property of the shop, but a

11 review of the receipt book showed that McKinney had given the seller a receipt for the gun.

12 McKinney was fired.  This information was given to ATF Agent Brad Devlin.  Agent

13 Devlin claims to have gone to the US Attorney's office to press charges.  Agent Devlin

14 said that the US Attorney's office said they "were not going to spend a quarter of a million

15 dollars prosecuting Mr. McKinney."  No further action was taken – except against me.

16      Although US Attorney, John McKay, said that there was not sufficient evidence to

17 bring firearm related charges against me, my Federal Firearms License had already been

18 revoked.  I'd been forced to sell my hard-earned business for a song.  I'd been indicted for

19 income tax violations.  I'd been sued by a special interest group.  I'd been smeared by

20 every news organization in the country and I couldn't get anyone interested in going after

21 these felons who were responsible for so much deceit.

22

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-25

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

On October 7, 2003, McKinney came into my office and set two handguns down on my desk – an Arminius revolver and a High Standard pistol, both in 22 LR caliber. He said, "Here's a couple for the museum." In the past, I would collect some of the odd balls that came into the shop for a curio display and to make the place interesting. McKinney's act was completely inappropriate, as the sale of the shop had already gone through to Mr. Kindschuh and the guns, if acquired by the shop, were his rightful property. This is true even though he was using my A&D book pending his soon-to-be-issued license. I told McKinney this and he took the guns back downstairs. I followed him down to check the purchase invoice and noticed that, besides the two guns, there was also a knife, which I found hidden by his workstation. I confiscated the knife, notified Mr. Kindschuh and handed him the two handguns for proper processing. Mr. Kindschuh told McKinney to transfer the guns to Ron Soderquist, a local gunsmith who happened to be standing there and expressed an interest in them. Soderquist, having a Federal Firearms License on file, took the guns and left. As I prepared my records for turn-in to the ATF, I came across the entry of those two guns on the acquisition page of the A&D book, but they were not signed out on the disposition page. McKinney had not signed the guns out. They were an open disposition, with no paper trail.

Ron Soderquist told me soon after I opened for business that he "guaranteed" Dennis Harding, a former employee, had stolen from me, "just as he had at Eagle Guns and Knives" where they had worked together. Knowing where Harding lived at the time, I confronted him about this and he lied. I know this to be true, as his roommate would later attest.

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-26

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

McKinney "acquired" 43 guns "on paper" from Bull's Eye and who knows how many without paper. All I can prove is that he most certainly was taking them. These thefts by McKinney took place before, during and after the investigation began.

McKinney would show up for work a couple of hours early, before anyone else, on many occasions, but no extra work seemed to get done.

McKinney would brag openly around the shop that he had hundreds of guns, yet when ATF Agent Brad Devlin finally went to his house, after months had gone by, they were nowhere to be found and he denied having them.

The business reports generated by the new shop owner show a massive increase in profits with a very similar sales volume. This can only be the result of previous internal shrinkage.

McKinney also claims that he was given guns for pay: he was a salaried employee. This is a lie and proves the collaboration between McCollum, McNally, Nagy and himself. Check his 1040 to see if he has bartered goods as claimed income. If not, he's a tax evader.

5.    <u>Dave Reinikka</u>. Dave Reinikka was my main buyer for years. I fired Dave soon after the investigation began for failure to follow my instructions to cancel all promotional events scheduled for the shop until things settled down. I later found out that Dave had been stealing cash from me, in the form of cash rebates, which were given at an annual dealer show for purchases. Dave denies this, but it's pretty obvious. I went to the show for the first time after I fired Dave. They were handing out cash and, after asking, they told me that they had been doing so for years. Although this is a serious crime,

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1  probably adding up to thousands over the years, I don't believe Dave was involved with the

2  collaboration and conspiracy of the others.

3      6.    Earl Lee Dancy.  Earl Lee Dancy, a friend and accomplice of John

4  Muhammad, came into my shop on November 18, 2001 and purchased a Remington model

5  700 rifle in .308 Winchester caliber.

6      Despite the warning signs hanging around the shop stating, "Don't LIE for the other

7  guy," an awareness program kicked off by the National Shooting Sports Foundation, with

8  visible penalties of 10 years in jail and $250,000 in fines, Earl Dancy lied on the form 4473

9  and straw-purchased that rifle for John Muhammad.

10     Earl Dancy loaned Lee Malvo a 45ACP caliber handgun which he used to murder a

11  young mother, Keenya Cook, in Tacoma on February 16, 2002.

12     Earl Dancy also loaned Muhammad yet another gun, a 44 magnum revolver which

13  he used to shoot up a church in Tacoma.

14     I believe that Malvo and Muhammad used that Remington rifle to murder a man on

15  a golf course in Tucson, Arizona on March 19, 2002, but no one seems to want to go there.

16     Two young men in Spanaway, Washington turned over the Remington rifle to a

17  Pierce County Sheriff's Deputy, Denny Wood, on 15 Sept, 2002.  The men claim that they

18  left an apartment, drove across a field and found the rifle, pointing at the apartment they

19  had just exited.  The Sheriff's Department failed to properly investigate the situation,

20  which would have entailed tracing the rifle from manufacturer, to distributor, to seller.  If

21  this simple task would have been performed then, rather than later, much carnage could

22  have been prevented.  To make matters worse, Muhammad instructed Dancy to report the

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-28

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1    rifle stolen to the Fife Police Department. He did, and they failed to input the information

2    into the stolen weapons data base, thus ensuring that there could be no connection.

3        These were two golden opportunities to stop the killing before it got started, yet this

4    is somehow acceptable.

5        Earl Dancy lied to investigators, and at Muhammad's trial he perjured himself into

6    a corner until he could back no further. Only then did he admit to being a liar and finally

7    came clean.

8        Earl Dancy received one year probation in Judge Arnold's courtroom in US District

9    Court in Tacoma. Judge Arnold stated, "You were caught up in a difficult set of

10   circumstances."

11       It is my understanding that Muhammad gave Dancy cash to purchase that rifle from

12   my shop. I'd like to know who he did this "cash deal" with, how much he spent and what

13   accessories he got with the deal. Was there a scope mounted on the rifle in my shop, and if

14   so, by who? The rifle's barrel had been shortened and threaded when it was recovered

15   from the field in Spanaway. Who did this, where, when and why?

16       7.    Robert Holmes. Robert Holmes is Muhammad's friend, who called the FBI

17   and told them that he suspected the Beltway Sniper was Muhammad. Mr. Holmes received

18   over $300,000 for his tip.

19       Mr. Holmes told investigators that in April of 2002, Muhammad and an "associate"

20   visited him with an "AR-15 assault rifle" and another bolt-action hunting rifle. This is a

21   couple of months before my shop received the AR-15 type rifle they used on their spree

22

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-29

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1  and well after Muhammad sold back to Welcher's Gun Shop the one he had purchased

2  from them.  Where did that rifle come from and where is it?

3      Although Muhammad sold to Welcher's Gun Shop an AR-15 assault rifle on May

4  23, 2000, proving that he was in possession of it two months after a protection order was

5  granted against him, law enforcement took no action against him – another lost

6  opportunity.

7

8      I certify under penalty of perjury under the laws of the State of Washington that the

9  foregoing is true and correct.

10

11     Respectfully submitted this 17th day of August 2007.

12

13              /s/_____
               Brian D. Borgelt

14

15

16

17

18

19

20

21

22

FIRST SUPPLEMENTAL DECLARATION
OF BRIAN D. BORGELT-30

CABLE, LANGENBACH,
KINERK & BAUER, LLP
SUITE 3500
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800